STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-03-190
*TDW - CUM - 11/18/2004*

DANIEL PERKINS,

Plaintiff

v.                                                                                    ORDER

CITY ENTERPRISES I, LLC, et al,                     DONALD L. ~~~~~~~~
                                                                          U~~~~~~~~

Defendants
                                                                          DEC 30 2004

This is an action by Daniel Perkins, former manager of the Motor City Nissan

dealership in Saco, against defendants City Enterprises I, LLC ("City Enterprises"), Forest City

Chevrolet, Inc. ("Forest City"), and James Burke. City Enterprises is the owner of the Motor

City Nissan dealership, which is one of several dealerships affiliated with Forest City. Burke is

the majority owner of both City Enterprises and Forest City.

Perkins is suing the defendants based on allegations that they breached his employment

contract by terminating him without cause (Complaint, count II), that they violated Maine's

wage payment statute by failing to pay him all amounts he was due at the time of his

termination (count III), that they subjected him to defamation and portrayed him in a false

light (count V), that they engaged in intentional and reckless infliction of emotional distress

(count VI), and that Forest City wrongfully and intentionally interfered with his contractual

relationship with City Enterprises (count VIII).[1] One of defendants' arguments in response to

---

[1] At an earlier stage in this litigation, Perkins asserted wrongful termination, whistleblower, and negligent infliction of emotional distress claims but those claims, contained in counts IV and VII of the complaint, were dismissed by order filed January 14, 2004.

Perkins's breach of contract claim is that the employment agreement relied on by Perkins was unauthorized. In count IX of his complaint, Perkins alleges that if defendants prevail on that issue, they are guilty of negligent misrepresentation. Finally, in count I of his complaint, Perkins is seeking a declaratory judgment that the alleged multi-year employment contract on which he bases his breach of contract claim is not subject to the statute of frauds.

Before the court is defendants' motion for summary judgment.[2] Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. See Handy Boat Service, Inc. v. Professional Services, Inc., 1998 ME 134, ¶ 16, 711 A.2d 1306, 1310 (construing former Rule 7(d)). The facts must be considered in the light most favorable to the non-moving party. E.g., Panasonic Communications & Systems Co. v. State of Maine, 1997 ME 43, ¶10, 691 A.2d 190, 194. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. Harkness v. Fitzgerald, 1997 ME 207, ¶5, 701 A.2d 370, 372.

In many respects, the submissions filed by plaintiff and defendants on the instant motion are the kind of submissions that give summary judgment a bad name. In support of its motion, defendant submitted a statement of material facts that consisted of 27 pages and 221

---

[2] Also pending before the court are two other motions: a motion for partial summary judgment filed by Perkins, and a motion by defendants to clarify plaintiff's right to a jury trial on counts I and III of the complaint. Those motions will be addressed in a separate order. Originally there were two other motions to be decided as well – a motion for summary judgment filed by third party defendant William Donahue and a motion to amend the third party complaint filed by defendants. Because the third party complaint has since been dismissed with prejudice, those two motions are moot.

paragraphs. Plaintiff responded with an opposing statement of material facts totaling 61 pages, 35 of which were in response to defendants' statement of material facts and the remaining 26 pages of which were devoted to approximately 124 paragraphs of so-called "additional" facts.[3] See M.R.Civ.P. 56(h)(2). As defendants point out, some of the numbered paragraphs in plaintiff's statement of additional facts contain multiple factual assertions, a practice which arguably violates Rule 56(h)(2) and which certainly makes harder the court's task of determining what facts are disputed. Plaintiff's statement of additional facts predictably elicited a further lengthy submission from defendant — specifically, a 33 page reply statement of material facts.

Submissions that total 121 pages and 345 paragraphs reciting the parties' positions in tendentious detail cannot be found to constitute "short and concise" statements as required by Rule 56(h)(1)-(3). Moreover, after undertaking the lengthy task of reviewing the parties' statements of material facts and the record citations offered in support thereof, the court has found that, in a large number of the instances in which factual assertions have been denied or qualified (by both sides), the parties are actually engaged in what can most charitably be described as quibbling. There are also instances in which both sides have cluttered the record with objections that are without merit.[4]

---

[3] Although the final paragraph of plaintiff's additional facts is numbered as ¶118, there are a half dozen instances where plaintiff, apparently to avoid renumbering, has inserted additional paragraphs by numbering them as "31(a), "83(b)" etc.

[4] By way of example, plaintiff has objected to defendants' record citations to his own complaint as not supported by a citation to record evidence that would be admissible at trial. E.g., Plaintiff's Statement of Material Facts in Dispute filed March 4, 2004, ¶¶33, 43-45, 146, 148, 151, 153-55, 160-63, 189-90, 194, 203, 208-09, 211-14. However, the court can take judicial notice of pleadings in its files and such pleadings are admissible as party admissions under M.R.Evid. 803(d)(2). Moreover, in his own statement of additional facts, plaintiff has cited to his opponents' pleadings – without acknowledging the inconsistency in his position. See Plaintiff's Statement of Additional Facts, filed March 4, 2004, ¶37.

For their part, although correctly objecting to many of plaintiff's additional facts as not set forth in separately numbered paragraphs, defendants have also raised the same objection even when plaintiff has limited his paragraphs to only one fact. See, e.g., Defendants' Reply Statement of Material Facts, filed March 11, 2004, ¶¶ 31(c), 40, 41, 45-46, 52-54, 56, 62-63, 74-75, 77-79, 83(b), 86, 101, 111(b). Such objections serve only to increase the word count and make the court's job more difficult.

Notwithstanding the various deficiencies in the parties' submissions, the court has done its best to plow through the parties' statements of material facts and to discern whether there are issues of material fact requiring a trial on each of plaintiff's causes of action.[5] Counsel should be reminded, however, that the summary judgment rule contemplates that both movants and parties opposing summary judgment should use rifles, not blunderbusses, in their approach to the facts.

1.    Statute of Frauds

As noted above, in considering defendants' motion for summary judgment, the court must resolve any factual disputes in favor of the plaintiff. The core dispute in this case is Perkins' contention that his July 2002 termination as general manager of the Motor City Nissan dealership was in violation of an employment contract which he had entered into with William Donahue, a managing member of City Enterprises who was also general manager of Forest City, in February 2002. That employment contract, according to Perkins, had been necessary to lure him to Motor City Nissan from a secure job as a general sales manager with another dealership, and it called for Perkins to receive a salary of $150,000 per year, plus benefits including three weeks of paid vacation, "until I retired in my late fifties." Perkins Affidavit sworn to March 3, 2004 at ¶16.

Defendants' initial response is that the employment contract relied upon by Perkins is a contract calling for performance over a period of years and is therefore subject to the statute of

---

[5] In other circumstances, the court would have been strongly tempted to order both parties to refile their statements of material facts with a limit on the number of paragraphs and a directive not to clutter the record with insignificant facts, meritless objections, and quibbling. It did not do that in this case because this motion has been under advisement for some time due to the press of other business, and a further round of papers would engender more delay without necessarily making the court's task any easier.

4

frauds.[6] See 33 M.R.S.A. § 51(5). The problem with this argument is that on September 3, 2002, Donahue signed a statement attesting to the existence of Perkins's employment contract.[7] See Defendants' Statement of Material Facts filed February 12, 2004, ¶135 and Exhibit 3 thereto. Donahue has also acknowledged the existence of Perkins's employment contract in sworn testimony. See Dehahn v. Innes, 356 A.2d 711, 717-18 (Me. 1976).

Defendants persevere, pointing out that Donahue had been suspended from his position as general manager of Forest City before Perkins was terminated at Motor City Nissan and arguing that by the time Donahue signed his September 3, 2002 statement and by the time of his testimony in this action, Donahue was no longer a person "lawfully authorized" to acknowledge the contract under 33 M.R.S.A. §51.[8] The Law Court, however, has not required that the written or testimonial acknowledgement of a contract subject to the statute of frauds come from a person who was an authorized agent at the time of the acknowledgement. See Mercier v. Town of Fairfield, 628 A.2d 1053, 1055 (Me. 1993). Moreover, even absent Mercier, it appears that Donahue remained a managing member of City Enterprises I, LLC when he signed his September 3, 2002 statement, notwithstanding his prior termination as general manager of Forest City. See Horace Horton Affidavit, sworn to March 10, 2004, at ¶11. Thus, at that time Donahue was still lawfully authorized to acknowledge the existence of Perkins's employment contract.

To be sure, various factual disputes remain. For instance, Donahue's September 3, 2002 statement states that Perkins's employment contract for $150,000 per year was with Forest

---

[6] Defendants also argue that even if an alleged employment agreement was entered into as described by Perkins, Donahue was not authorized to offer the terms in question. The court has reviewed the record and concludes that there are disputed issues of fact for trial on the issue of Donahue's authority.

[7] Although denominated as an affidavit, Donahue's statement was not sworn to before a notary or an attorney at law. This issue is immaterial because all 33 M.R.S.A. § 51(5) requires is a signed writing, not that the signature be under oath.

[8] There is separate litigation brought by Donahue against the defendants in this action relating to Donahue's departure from Forest City and the fact that he remains a minority owner of Forest City and City Enterprises. This court understands that the litigation brought by Donahue is in the process of being settled.

City, whereas Perkins's actual employer appears to have been City Enterprises. This is only one of a number of instances in which there exists some confusion and dispute over the relationship between Forest City and Motor City Nissan. While it appears to be undisputed that Forest City is the primary dealership in a family of dealerships that includes Motor City Nissan, Perkins's employment status as between Forest City and Motor City Nissan presents a disputed factual issue that cannot be resolved on summary judgment.[9] Defendants' motion for summary judgment dismissing count II of the complaint on statute of frauds grounds is denied.

Indeed, on the basis of Donahue's September 3, 2002 written statement and Donahue's sworn testimony confirming the employment agreement he reached with Perkins, the court concludes that Perkins is entitled to partial summary judgment that the statute of frauds does not preclude his claim that he had a multiyear employment contract with an annual salary of $150,000. Under Rule 56(c) summary judgment may be rendered against the moving party, and in this case Perkins is entitled to a ruling that the statute of frauds does not bar his contract claims. This does not mean that the court accepts as undisputed the fact that a multiyear employment contract was entered into. Defendants remain entitled to argue that Donahue and Perkins did not in fact reach a multiyear agreement as they now claim or that any oral agreements they reached were superseded by subsequent writings. On those issues, however, the statute of frauds issues merge with the merits of Perkins's contract claims. In the court's

---

[9] The court reaches the same conclusion with respect to defendants' arguments based on a Forest City employment application that Perkins signed on February 4, 2002. Although this document included (in its small print) a pre-printed acknowledgement of "at will" employment status, Perkins has testified that he only signed this document in order to get paid after he had already entered into a different arrangement with Donahue, and he argues that the document should not be given any effect because his actual employer was City Enterprises, not Forest City. The effect of the February 4, 2002 employment application is a disputed issue for trial.

6

view, Donahue's acknowledgement of a multiyear contract removes this case from the statute of frauds.

2.     Indeterminate Length of Contract

There remains to be considered defendants' separate argument that even if an agreement was reached as testified to by Perkins and Donahue, Perkins's status remained that of an "at will" employee under Maine law, and defendants were therefore entitled to terminate him without incurring any contractual liability.

Under governing Law Court precedent, contracts for employment are deemed to be terminable at will unless (1) the contract expressly provides that employment may only be terminated for cause or (2) the contract is for a definite term. See, e.g., Taliento v. Portland West Neighborhood Planning Council, 1997 ME 194, ¶9, 705 A.2d 696, 699; Burnell v. Town of Kingfield, 686 A.2d 1072, 1073 (Me. 1996). In this case, there is no testimony or evidence that termination for cause was ever discussed between Perkins and Donahue in February 2002 when, according to their mutual testimony, they reached agreement on Perkins's employment contract. Moreover, to the extent that it might be argued that a termination for cause provision should be implied from the discussion between Perkins and Donahue, the Law Court has been clear that a termination for cause provision cannot be implied but must be express. See Bard v. Bath Iron Works Corp., 590 A.2d 152, 156 (Me. 1991); Libby v. Calais Regional Hospital, 554 A.2d 1181, 1183 (Me. 1989).

That leaves the question whether the employment agreement at issue here, as testified to by Perkins and Donahue, was not terminable at will because it constituted a contract for a definite term. This is a very close question under Maine law.

Construed most favorably to Perkins, the discussions between Donahue and Perkins in February 2002 were to the effect that Perkins was seeking assurances that if he left his current

7

job, the position Donahue was offering was one in which Perkins could remain until he retired. Perkins told Donahue that he was looking to retire in his late fifties, or when he was 57 or 58, and Donahue offered Perkins the job on that basis. See Donahue's September 3, 2002 written statement ¶¶9-11, 13; Donahue Dep. 83, 168; Perkins Dep. (Jan 23, 2004) 59-61. Donahue testified, however, that he never guaranteed Perkins a specific duration of employment. Donahue Dep. 16.

Perkins confirmed that he and Donahue had not discussed a specific retirement date but that they had discussed a retirement "time frame" — variously expressed as when Perkins was in his late fifties or when he was 57 or 58. Perkins Dep. (Jan. 23, 2004) 60. Perkins acknowledged that this meant the end date of his employment contract could have been any date within a couple of years. Id. He also testified that he understood he could retire earlier if he wanted, so there was "no definite end" to his employment contract, although he added that he did not think he could afford to retire earlier. Id. 59-61.[10]

The above testimony puts this case very close to the boundary between contracts that have been found to be of indeterminate length and contracts that have been found to be for a sufficiently definite term. In Buchanan v. Martin Marietta Corp., 494 A.2d 677, 678-79 (Me. 1985), the Law Court found that an employer's statement that Buchanan would have a job "through his retirement date in 1991" was sufficient to establish a contract for a definite term. In Terrio v. Millinocket Community Hospital, 379 A.2d 135, 137-38 (Me. 1977), the Law Court similarly found a definite term in an employer's statement that Ms. Terrio was secure in her job for the rest of her life, coupled with evidence that the hospital had established the first day of the month in which an employee reached 65 as the normal retirement date for its employees.

---

[10] The affidavit submitted by Perkins is consistent with this testimony. See Perkins Aff. sworn to March 3, 2004 ¶¶ 16-17.

8

In contrast, the Law Court ruled more recently in Rancourt v. Waterville Osteopathic Hospital, 526 A.2d 1385, 1389 (Me. 1987), that an employer's statement that Ms. Rancourt could keep her job "as long as she wanted it" created "nothing more than a contract of employment for a indefinite period of time that was terminable at will by either party." Likewise, in Burnell v. Town of Kingfield the Law Court concluded that a promise by the town clerk to employ Burnell for 20.5 hours per week until another employee retired was insufficient to establish a contract for a "determinate, measurable " period of time. 686 A.2d at 1073-74. Notably, although continuing to cite Terrio, the Law Court in Burnell also cited with approval federal decisions holding that a promise of employment "until retirement" did not constitute a contract for a definite term. See 686 A.2d at 1074, citing Kristufek v. Saxonburg Ceramics Inc., 901 F. Supp. 1018, 1025 (W.D.N.C. 1994), and Engstrom v. John Nuveen & Co., Inc., 668 F. Supp. 953, 960 (E.D.Pa. 1987).

Plaintiff points out that around the same time the Law Court decided Burnell, it also found that the plaintiffs in Gayer v. Bath Iron Works Corp., 687 A.2d 617, 620 (Me. 1996), had submitted sufficient evidence to create a genuine issue for trial as to whether they had been offered employment for a fixed term. In Gayer, however, there had been an acknowledgement by the defendant in deposition testimony that the plaintiffs had been hired for a four year term of employment contingent on the satisfactory completion of their training. Id.

The court views the law in this area as ripe for clarification by the Law Court. Plaintiff has forcefully argued that Rancourt and Burnell are distinguishable and that that his contract was sufficiently definite under Terrio and Buchanan. Nevertheless, the court is ultimately persuaded that if a "fixed period of time capable of measurement" and "tied to a certain date" is necessary, see Burnell, 686 A.2d at 1074, the evidence in this case, construed in plaintiff's favor, falls short. In Buchanan the contract had a definite term ending with plaintiff's retirement date in 1991. In Gayer the plaintiffs had been promised a four year term. In Terrio,

even though the court may have stretched to sustain the contract, it was able to discern a fixed termination date on Ms. Terrio's 65th birthday. In this case, in contrast, no fixed termination date can be discerned. At best, the contract had an approximate duration until Perkins was 57, 58 or 59 (depending on whether the references to "57 or 58" or the references to "late fifties" are controlling), with Perkins free to retire earlier if he desired.

Under Maine law as it has evolved since Terrio, the contract testified to by Perkins and Donahue was not for a definite term, and Perkins's employment was therefore terminable at will. In reaching this result, the court concurs with Perkins's own deposition testimony that there was "no definite end" to his employment under the contract. Perkins Dep. (Jan. 23, 2004) 59. Defendants are entitled to summary judgment on count II.

## 3.    Statutory Wage Claims

A different conclusion obtains with respect to the statutory wage claims asserted by Perkins in count III. Regardless of whether his contract was terminable at will, Perkins has offered evidence that he was given the Motor City Nissan job at a weekly salary of $1,500 with a guaranteed monthly bonus of $6,000 not tied to performance and three weeks of annual vacation. It appears to be undisputed that when he was terminated on July 20, 2002, Perkins was paid $1,500 for his final week of work and thereafter received a $1,000 bonus payment. See Defendants' Statement of Material Facts filed February 12, 2002 ¶147 (admitted). Even if his bonus should have been pro-rated — an issue that is disputed by the parties — this was less that the $4,000 bonus that Perkins would have been entitled to for the 20 days he worked

in July.[11] Defendants have raised a number of other issues in defense of Perkins's wage claim, but there are genuine issues for trial as to all of those issues. As a result, defendants' motion for summary judgment with respect to count III of the complaint is denied.

4.     Defamation and False Light Claims

A.     False Light Allegations

In the portion of his submissions relating to his defamation and false light claims, Perkins places his greatest emphasis on the contention that defendants portrayed him in a false light because he was terminated from his position at Motor City Nissan one day after Donahue was suspended from his position as General Manager of Forest City and that Perkins therefore became associated in the public mind with claims of wrongdoing that were lodged against Donahue.

The essential elements of a false light claim are set forth in Restatement (Second) of Torts § 652E (1977):

> One who gives publicity to a matter concerning another that places
> the other before the public in a false light is subject to liability ...

(emphasis added). See Cole v. Chandler, 2000 ME 104, ¶17, 752 A.2d 1189, 1197. Publicity requires communication to the public at large or to a sufficient number of persons so that it must be regarded as substantially certain to become a matter of public knowledge. Restatement (Second) of Torts § 652D, comment a; Cole, 2000 ME 104, ¶17, 752 A.2d at 1197.

---

[11] There is also a factual dispute for trial relating to vacation pay. According to Perkins, as noted above, his employment contract called for three weeks of paid vacation. The complaint alleges that he had only taken four paid vacation days at the time of his termination. Complaint ¶49. Defendants' position is that Perkins was not entitled to any paid vacation, so the four vacation days for which he was paid represented four days more than he was entitled to. Crediting Perkins's version of the facts, however, he would have been entitled to a least 1.5 weeks of paid vacation when he was terminated after six months even if his three weeks of vacation time had to be prorated (again, an issue disputed by the parties). At a minimum, therefore, if Perkins prevails at trial, he would be entitled to three or four additional days of paid vacation.

11

In this case, Perkins has not pointed to any evidence that the defendants publicized his termination.

Perkins has offered evidence that persons in the car dealership industry have made statements to the effect that they had heard that Donahue was removed from Forest City in handcuffs and Perkins was terminated the next day. Perkins Dep. (Jan. 23, 2004) 75-77.[12] Perkins may or may not be correct that the juxtaposition of these events might have created an impression of guilt by association in some minds — although Perkins also testified that no one he had talked to indicated that Perkins (as opposed to Donahue) had been accused of wrongdoing. Perkins Dep. (Jan. 23, 2004) 77. However, this cannot surmount the lack of any evidence that any defendant publicized Perkins's termination in any manner at all, let alone that they did so in a manner that linked Perkins to alleged wrongdoing by Donahue or otherwise portrayed him in a false light. Defendants are therefore entitled to summary judgment on Perkins's claims that they invaded his privacy by publicly portraying him in a false light. See Cole v. Chandler, 2000 ME 104, ¶18, 752 A.2d at 1197.

B.    Defamation Claims

Plaintiff has also asserted defamation claims based on three specific incidents: (1) comments made by Forest City employees at a meeting held at the Tortilla Flats restaurant on July 18, 2002; (2) an instance of compelled self-publication when Perkins was allegedly obliged to repeat false reasons for his termination at a subsequent job interview; and (3) statements made by defendants in a response they filed with the Department of Labor after Perkins filed for unemployment compensation. See, e.g., Plaintiff's Statement of Additional Material Facts,

---

[12] In fact, Donahue was not removed in handcuffs although the police were called (by Donahue) at the time of his suspension. Perkins Dep. (Jan. 23, 2004) 73-74.

filed March 4, 2004 ¶61; Plaintiff's Statement of Material Facts in Dispute, filed March 4, 2004 ¶¶165, 186.

In his memorandum of law, however, Perkins does not dispute that Defendants are entitled to statutory immunity for any statements made in the information they provided to the Department of Labor in connection with the unemployment compensation claim. See 26 M.R.S.A. § 1407 (Supp. 2003). As a result, the court needs to focus only on the Tortilla Flats meeting and the alleged instance of compelled self-publication.


C.      Statements at Tortilla Flats Restaurant

With respect to the Tortilla Flats meeting, the evidence submitted by plaintiff is that defendant Burke met with five Forest City executives, specifically excluding Perkins and Donahue, at or after 5 p.m. on July 18, 2002 at a restaurant called Tortilla Flats.[13] In the course of that meeting, which was called because of concerns Burke had with respect to Donahue's role at Forest City and its affiliated dealerships, Perkins's performance was discussed in passing. Specifically, Perkins has offered evidence that comments were made that he was lazy, that he did not have a strong work ethic, and that he was good at taking praise and very good at dishing out blame if things did not go well. William Shackford Dep. 67. Comments were also made based on the financial results of the Motor City Nissan dealership and concerns were expressed "about why it was okay to have these deficiencies." Id. 68.

The elements of a cause of action for defamation are (1) a false and defamatory statement concerning another person; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence; and (4) either actionability of the statement irrespective of

---

[13] Perkins's complaint does not mention the statements made at Tortilla Flats in its allegations with respect to defamation. However, Perkins has concentrated on those statements in his papers opposing summary judgment, and defendants have not objected to plaintiff's reliance on those statements as a basis for his defamation claim.

13

special harm or the existence of special harm caused by the publication. See Rice v. Alley, 2002 ME 43, ¶ 19, 791 A.2d 932, 936; Restatement (Second) of Torts § 558 (1977). In this case there is a significant question whether the statements relied on by Perkins are mere expressions of opinion that cannot form a basis for defamation. For present purposes, however, the court will assume that the statements as to Perkins's laziness and his ability to dish out blame are statements of opinion that imply undisclosed defamatory facts. See Lester v. Powers, 596 A.2d 65, 71 (Me. 1991); Restatement (Second) of Torts § 566. The court has a different view about the testimony that some reference was made to the financial results at Motor City Nissan and to unspecified deficiencies with respect thereto. Standing alone, those comments are too vague to be defamatory and cannot be found to be defamatory of Perkins.

In light of Staples v. Bangor Hydro-Electric Co., 629 A.2d 601, 603-04 (Me. 1993), statements by Forest City employees about Perkins can form the basis for liability on the part of Forest City, even when those statements are made to other Forest City employees. Nevertheless, the undisputed facts establish that any defamatory statements made about Perkins at the Tortilla Flats meeting were conditionally privileged. See Lester v. Powers, 596 A.2d at 70; Onat v. Penobscot Bay Medical Center, 574 A.2d 872, 874 (Me. 1990); Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989). The record before the court demonstrates that the purpose of the Tortilla Flats meeting was for Burke to hear from a selected group of managers any concerns they had about Donahue and the current operation of the dealership.[14] See Defendants' Statement of Material Facts filed February 12, 2004 ¶93. See also Plaintiff's Statement of Additional Facts filed March 4, 2004 ¶44. Although plaintiff argues that the Tortilla Flats gathering was more of an after work gossip session, see Plaintiff's Statement of

---

[14] Perkins repeatedly emphasizes in his papers that this meeting was held at a public restaurant rather than at the Forest City offices. However, he has offered no evidence that any restaurant customers or other members of the public overheard any part of the conversation.

14

Material Facts in Dispute ¶93 (qualifying defendants' ¶93), this would not vitiate the privilege. Thus, although the Tortilla Flats meeting was not a formal peer review setting, such a setting is not required to establish a conditional privilege so long as the circumstances establish that there was a societal interest in promoting candor on the occasion in question. See, e.g., Rice v. Alley, 2002 ME 43 ¶22, 791 A.2d at 936-37; Lester v. Powers, 596 A.2d at 69; Restatement (Second) of Torts §§ 595, 596. In this instance there is a societal interest in allowing a majority shareholder and managing member of a group of car dealerships to receive feedback about the operations of those dealerships from managerial personnel.

However, just because a conditional privilege exists does not provide a license for defamation. A conditional privilege is defeated if the person publishing the defamatory information knows his statement to be false or acts in reckless disregard of its truth or falsity. See Restatement (Second) of Torts § 600; Lester v. Powers, 596 A.2d at 71-72. Perkins has not, however, offered any evidence that any of the managers who made allegedly defamatory statements at Tortilla Flats[15] either knew their statements to be false or acted in reckless disregard of their truth or falsity.

A conditional privilege also may not exist if statements are not made for the purpose of furthering the interest giving rise to the privilege (in this instance, allowing candid feedback to a business owner on the business's managerial personnel) but are made solely out of spite or ill will. Restatement (Second) of Torts § 603; Lester v. Powers, 596 A.2d at 70-71. Statements that are inspired partly by spite or ill will but that are also made for the purpose of furthering

---

[15] The specific managers making the allegedly defamatory statements are not identified with the exception of William Shackford, who acknowledged at his deposition that he and unspecified others made statements to the effect that Perkins was lazy and was good at deflecting blame. Shackford Dep. 67-69. In the court's view, under Staples v. Bangor Hydro-Electric Co., 629 A.2d at 603-04, it does not matter for purposes of agency law whether the actual speakers in addition to Shackford can be identified by name so long as there is evidence they were Forest City managers. Notably, no evidence was offered that defendant Burke made any of the allegedly defamatory statements. See Defendants' Statement of Material Facts filed February 12, 2004 at ¶180; Perkins Dep. (Jan. 23, 2004) 72; Shackford Dep. 69, 71.

15

the interest giving rise to the privilege remain conditionally privileged. Id. In this case, in response to defendants' motion for summary judgment, Perkins has not demonstrated the existence of a disputed issue for trial as to whether any of the managers who made statements about him at Tortilla Flats did so solely out of ill will.

The only evidence that Perkins has attempted to offer that statements at Tortilla Flats were motivated by ill will relate to Shackford, and this consists of a bare assertion in Perkins's affidavit that Shackford was jealous of him. See Perkins Aff. sworn to March 3, 2004 ¶24. Perkins's assertion as to his "belief" that Shackford was jealous is not cognizable evidence that Shackford was in fact jealous, let alone that Shackford's statements at Tortilla Flats were inspired by spite or ill will. Even if Perkins's belief could form a basis for concluding that Shackford's statements may have partly resulted from jealousy, moreover, they do not constitute sufficient evidence to create a factual dispute for trial as to whether Shackford's statements were solely inspired by ill will. See Lester v. Powers, 596 A.2d at 70-71.[16]

### D. Compelled Self-Publication

The other contention relied on plaintiff to resist summary judgment on his defamation claim is that he was compelled to tell Win Dodge of the false reasons given by City Enterprises for his termination. See Plaintiff's Statement of Material Facts in Dispute ¶¶169, 186. The Law Court has expressly reserved the question of whether Maine law permits a defamation claim to be based on compelled self-publication. Cole v. Chandler, 2000 ME 104, ¶5, 752 A.2d at 1193. However, federal judges sitting in Maine have predicted that Maine would recognize defamation claims based on compelled self-publication, but only where it was reasonably

---

[16] Lester v. Powers demonstrates that merely offering evidence from which an inference can conceivably be drawn against the validity of a conditional privilege is insufficient to defeat summary judgment in a defamation case. See 596 A.2d at 71-72 (inference that defendant's destruction of her notes prior to lawsuit demonstrated her knowledge of falsity was too speculative to defeat summary judgment).

16

foreseeable that the plaintiff would be placed under strong compulsion to repeat the defamatory statement. See Carey v. Mt. Desert Island Hospital, 910 F.Supp. 7, 11-13 (D.Me. 1995).

In this case, however, Perkins's defamation claim based on compelled self-publication fails because nowhere in the summary judgment record is there any recitation of the allegedly defamatory statements that Perkins states he repeated to Dodge.[17] Lester v. Powers establishes that if the record does not show what statements were made and if it therefore cannot be determined whether or not those statements were false or defamatory, summary judgment should be entered for the defendant. See 596 A.2d at 68. In a compelled self-publication case liability must be based on the falsity of what Perkins repeated to Dodge, and defendants are entitled to know exactly what Perkins said on that occasion. See Picard v. Brennan, 307 A.2d 833, 835 (Me. 1973).

In sum, Perkins has offered no evidence of any defamation by defendant Burke, and the other defendants are entitled to summary judgment on Perkins's claims of defamation by Forest City managers at Tortilla Flats and on his claim of compelled self-publication.

5.      Intentional Infliction of Emotional Distress

On Perkins's claim for intentional infliction of emotional distress, the court has reviewed the summary judgment record and has resolved any factual disputes in favor of Perkins. Nevertheless, on this record, it is doubtful that the facts advanced by Perkins create an issue for trial as to whether he suffered mental distress so severe "that no reasonable person

---

[17] The compelled self-publication relied on by Perkins is not mentioned in his complaint and is raised only in his Statement of Material Facts. See Plaintiff's Statement of Material Facts in Dispute filed March 4, 2004 at ¶169, citing Perkins's answer to interrogatory 22. At his deposition, Perkins made no mention of any compelled self-publication when he recounted his conversations with Win Dodge after his termination. Perkins Dep. (Jan. 23, 2004) 90-91. Given the absence in the record of any specificity as to what Perkins repeated to Dodge about this termination, the court does not need to consider the inconsistency between Perkins's deposition testimony and his answer to interrogatory 22. See Zip Lube, Inc. v. Coastal Savings Bank, 1998 ME 81 ¶10, 709 A.2d 733, 735.

17

could be expected to endure it." Curtis v. Porter, 2001 ME 158, ¶10, 784 A.2d 18, 22-23. The court does not have to reach this question, however, because it concludes that in any event Perkins has not generated a genuine dispute for trial as to whether defendants' conduct was sufficiently extreme and outrageous to allow recovery for intentional infliction of emotional distress.

What is required is "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bonds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, comment d. The issue of whether a defendant's alleged conduct is sufficiently extreme or outrageous to meet the above standard is an issue for the court to determine in the first instance. Champagne v. Mid-Maine Medical Center, 1998 ME 87, ¶16, 711 A.2d 842, 847. In this instance, defendants' alleged conduct, accepted as true for purposes of this motion, amounts to breaching an employment contract, terminating Perkins without cause, and advancing false reasons for the termination.[18] This alleged conduct, if proven, would be both unfair and wrongful, but it does not exceed all permissible bounds of decency, nor does it qualify as "atrocious and utterly intolerable in a civilized community."

The Law Court has held that in appropriate cases summary judgment may be granted dismissing claims for intentional infliction of emotional distress if the court concludes that the alleged conduct does not meet the applicable requirements for those claims as a matter of law. See, e.g., Barnes v. Zappia, 658 A.2d 1086, 1090 (Me. 1995) (upholding summary judgment dismissing claim of intentional infliction of emotional distress). Summary judgment is therefore entered dismissing count VI of plaintiff's complaint.

---

[18] As noted above, the court has already concluded that summary judgment should be granted against Perkins on his claims for wrongful termination, breach of a contract for a definite term, and defamation. This raises an issue as to whether a claim for intentional infliction of emotional distress may be a vehicle for asserting liability based on allegations that have been found wanting with respect to other causes of action. However, because the alleged conduct was not sufficiently extreme and outrageous, this issue need not be reached.

18

6. <u>Tortious Interference with Economic Relationship</u>

The elements of a claim for tortious interference with an economic relationship are (1) the existence of a valid contract or prospective economic advantage; (2) interference with that contract or advantage through fraud or intimidation; and (3) damages proximately caused by the interference. See <u>James v. MacDonald</u>, 1998 ME 148, ¶7, 712 A.2d 1054, 1057. At the outset, a claim for tortious interference with a contract cannot be brought against someone who is a party to the contract in question. A party who breaches a contract can be sued for breach but not for tortious interference. See <u>Harrison v. NetCentric Corp.</u>, 744 N.E.2d 622, 632 (Mass. 2001); Restatement (Second) of Torts § 766.

As the court understands it, therefore, Perkins is limiting his claim of tortious interference to Forest City. This is based on the theory that (1) Perkins had an employment contract with City Enterprises but (2) it was a Forest City employee, namely Shackford, who terminated him. The factual record before the court on summary judgment establishes that Shackford was authorized by Burke, the majority owner of City Enterprises and a managing member of City Enterprises, to make personnel decisions at Motor City Nissan and specifically to determine whether or not to retain Perkins. See Defendants' Statement of Material Facts filed February 12, 2004 ¶¶106-110. Perkins's response, see Plaintiff's Statement of Facts in Dispute filed March 4, 2004 ¶¶106-110, seems to be that Burke's delegation of authority to Shackford was not legally valid and that Perkins's termination therefore constituted tortious interference by Forest City (in the person of Shackford). Perkins does not, however, controvert defendants' factual showing that Burke had delegated Shackford to act on his behalf.

Regardless of the dispute between the parties as to whether Burke's delegation of authority to Shackford was legally authorized, the court does not see how it could be found on this record that Shackford's actions, even if not properly authorized, constituted contractual

19

interference by a third party. Thus, even if it is assumed that Shackford's actions were not properly authorized by Burke, such a lack of authority would not transmute Shackford's actions into tortious interference by Forest City. Properly authorized or not, Shackford was acting on behalf of Burke, a managing member of City Enterprises, and there was no third party interference.

Moreover, even if the court were to accept Perkins's theory that Shackford's actions, if unauthorized, constituted interference by Forest City, Perkins also has not demonstrated any disputed issue for trial as to whether any interference with his contract on the part of Shackford was accomplished through fraud or intimidation. Fraud or intimidation is a necessary element of tortious interference with a contract or an advantageous business relationship. See Rutland v. Mullen, 2002 ME 98, ¶¶13-16; 798 A.2d 1104, 1110-11; Gordan v. Cummings, 2000 ME 68, ¶15, 756 A.2d 942, 946. In this instance, while hotly disputing whether Shackford had the requisite authority, Perkins has not offered any evidence to suggest that either fraud or intimidation was employed and thus has not generated a factual issue for trial on those issues. In particular the court is at a loss to discern what false representations are alleged to have been made and justifiably relied on in connection with Perkins's termination. See Rutland, 2002 ME 98, ¶¶14-15, 798 A.2d at 1111. Nor is there any evidence of unlawful coercion or extortion which would support the conclusion that there are disputed facts to support to a claim of interference through intimidation. See id. ¶16, 798 A.2d at 1111.

Defendants are therefore entitled to summary judgment with respect to count VIII of the complaint.


7.    Negligent Misrepresentation

The negligent misrepresentation claim asserted in count IX of the complaint, which was added by amendment pursuant to order dated December 16, 2003, is based on the theory that

20

if it is found that Donahue was not authorized to hire plaintiff on the terms and conditions set forth in the oral conversation between Donahue and Perkins in February 2002 (and thereafter confirmed in Donahue's September 3, 2002 statement), City Enterprises should be held liable for negligent misrepresentation because Donahue negligently misrepresented that he had such authority. See Amended Complaint filed September 24, 2003 ¶99.

The court has previously noted that the extent of Donahue's authority is factually disputed and would also agree that if such authority were still a live issue, there would be disputed issues of fact as to plaintiff's negligent misrepresentation claim. However, the negligent misrepresentation claim is moot because, even assuming that Donahue had the requisite authority, the court has concluded that the employment agreement he reached with Perkins was not for a sufficiently definite term under Maine law and therefore remained a contract terminable at will.

Since nothing turns on whether Donahue had the requisite authority and if not, whether Donahue negligently misrepresented the extent of his authority, count IX of the complaint will be dismissed as moot.

The entry shall be:

On count I of the complaint, plaintiff is granted a declaratory judgment that under the particular circumstances of this case, his claim based on a multiyear employment contract is not barred by the statute of frauds. Defendants' motion for summary judgment dismissing counts II, V, VI, and VIII of the complaint is granted, and count IX of the complaint is dismissed as moot in light of the dismissal of count II.

Defendants' motion for summary judgment is denied as to count III of the complaint, and that count remains for trial.

The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: November 18, 2004

Thomas D. Warren
Justice, Superior Court

21

and County
Box 287
ine 04112-0287

JOHN CAMPBELL ESQ
PO BOX 369
PORTLAND ME 04112

F COURTS
and County
Box 287
ne 04112-0287

CHRISTIAN FOSTER ESQ
PO BOX 4803
 PORTLAND ME 04112

erland County
). Box 287
Maine 04112-0287

ROBERT KLINE ESQ
PO BOX 7859
PORTLAND ME 04112